ANDREA T. MARTINEZ, United States Attorney (#9313)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KARIN M. FOJTIK, Assistant United States Attorney (#7527)
AARON B. CLARK, Assistant United States Attorney (#15404)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682
Email:  Michael.Gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-mj-145 JCB |
| Plaintiff, | |
| | UNITED STATES' MOTION TO DETAIN THE DEFENDANT PENDING TRIAL |
| vs. | |
| COLIN ANDREW SHAPARD, | Judge Jared C. Bennett |
| Defendant. | |

Mr. Shapard represents an unmanageable risk of danger to the community and an unmanageable risk of flight, and for those reasons, the United States submits this memorandum in support of his detention pursuant 18 U.S.C. § 3142.  For the last eight years, Shapard has worked as a sophisticated seller of deadly opioids. Shapard shows no remorse for the harm his drugs have caused in the past. If not detained, Shapard will continue to distribute deadly opioids to youth in Park City, specifically, and Utah generally.

# TABLE OF CONTENTS

1. STATEMENT OF FACTS ................................................................................................ 3

   1.1   Background: Deaths in Park City ....................................................................... 3

   1.2   First Juvenile Death .......................................................................................... 4

   1.3   Second Juvenile Death ...................................................................................... 4

   1.4   2016 Flight from Jurisdiction ........................................................................... 5

   1.5   Prosecution in Juvenile System ........................................................................ 5

   1.6   Current Investigation ........................................................................................ 5

   1.7   High School Student Selling Shapard's Drugs .................................................. 5

   1.8   December 6th Seized Package ........................................................................... 6

   1.9   December 17th Seized Package ......................................................................... 8

   1.10  Distribution of Fentanyl to an Undercover Agent on January 31, 2022 ........... 9

   1.11  Distribution of Fentanyl to an Undercover Agent on February 14, 2022 ........ 10

   1.12  February 15th Seized Package ........................................................................ 12

   1.13  Defendant's Statements ................................................................................... 14

       1.13.1   Defendant's Statements regarding Pressing Pills .................................... 14

       1.13.2   Defendant's Statements exhibiting a Lack of Remorse ........................... 14

       1.13.3   Defendant's Statements regarding Violence............................................ 15

       1.13.4   Defendant's Statements regarding Drug Running .................................... 16

   1.14  Defendant's level of Sophistication ................................................................ 18

   1.15  Additional Packages........................................................................................ 20

   1.16  Student 1 Overdosed ....................................................................................... 21

2. ARGUMENT .............................................................................................................. 22

   2.1   Legal Standard and Burden of Proof ............................................................... 22

   2.2   Shapard presents an Unmanageable Risk of Danger to the Community .................... 24

       2.2.1   The nature and circumstance of the offense charged............................... 24

       2.2.2   The weight of the evidence against the defendant .................................. 26

       2.2.3   The history and characteristics of the defendant..................................... 26

       2.2.5   Subject to lengthy period of incarceration if convicted ........................... 30

       2.2.6   The nature and seriousness of the danger posed by the defendant ........... 31

   2.3   Shapard presents an Unmanageable Risk of Flight ................................................. 31

3. CONCLUSION ........................................................................................................... 32

## 1.    STATEMENT OF FACTS

"The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the detention hearing."[1]  Consequently, the United States intends to proceed by proffer, made both in this pleading and further at the upcoming hearing.[2]

### 1.1    Background: Deaths in Park City

1.    Shapard learned how to access Dark Net marketplaces, such as AlphaBay in 2016, by using TOR—an internet browser that allows users to access the Dark Net. Shapard used an operating system designed to wipe his digital footprints, but agents were still able to gather that by 2016 Shapard was searching Reddit and Google for information about the powerful synthetic opioid U-47700.

2.    Shapard set up two cryptocurrency wallets using a popular cryptocurrency exchange. Armed with cryptocurrency and access to AlphaBay, Shapard purchased U-47700 from a Dark Net vendor.

3.    Once he obtained the U-47700, Shapard mixed the U-47700 into bottles of mouth or nasal spray. He distributed the spray bottles containing U-47700 to juveniles in schools in the Park City area.

---

[1] 18 U.S.C. § 3142(f).
[2] *United States v. Smith*, 79 F.3d 1208, 1210 (D. C. Cir 1996) ("Every circuit to have considered the matter … [has] permitted the Government to proceed by way of proffer.").

Should the Court need testimony in support of this motion, the United States could provide a law enforcement agent to testify.

**1.2      First Juvenile Death**

4.      In the early hours of September 11, 2016, a mother in Park City, Utah, saw a light on in the bedroom of her thirteen-year-old child. When she looked in the room, she saw her child, who appeared to have fallen asleep on a laptop keyboard. Amused, she took a picture to show the child the following morning and then carefully slipped the laptop out from underneath her child. But, when morning came, the mother found her child was dead. Her child, juvenile victim 1 (JV1), died from overdosing on U-47700. The U-47700 came from Shapard.

**1.3      Second Juvenile Death**

5.      Prior to his death, JV1 texted his best friend, thirteen-year-old juvenile victim 2 (JV2), and told JV2 that JV1 was going to ingest all the remaining "pinky" [meaning U-47700] JV1 had left. JV2 learned about the death of JV1 and felt devastated. JV2 was also in possession of U-47700. The U-47700 came from Shapard.

6.      On the morning of September 13, 2016, JV2's father went to wake JV2. The father found JV2 deceased on a couch. JV2 died from overdosing on U-47700.

7.      Investigators quickly learned that Shapard had been distributing drugs in schools in the Park City area. Investigators executed warrants at the residences of Shapard's parents.

8.      Law enforcement and school officials sounded the alarm in an effort to protect other juveniles who might be in possession of drugs from Shapard. The community and, indeed, much of the nation was shocked.[3]

---

[3] Warnings were broadcast by local, national, and international media outlets, including for example, the Washington Post (https://www.washingtonpost.com/news/morning-mix/wp/2016/11/04/synthetic-opioid-nicknamed-pink-blamed-for-deaths-of-two-13-year-old-utah-boys/); NBC News (https://www.nbcnews.com/storyline/americas-heroin-epidemic/pink-stronger-heroin-legal-most-states-n666446); Daily Mail (https://www.dailymail.co.uk/news/article-3789948/Unexpected-deaths-two-best-friends-13-linked-dangerous-new-synthetic-drug-pinky.html); and Chicago Tribune

**1.4      2016 Flight from Jurisdiction**

9.      As investigators closed in on Shapard as a suspect, Shapard was flown by his father out of the jurisdiction to Hawaii.

**1.5      Prosecution in Juvenile System**

10.      Shapard was prosecuted in the juvenile court system in Utah.[4] Shapard had his felony charges dismissed, entered a plea to a misdemeanor Reckless Endangerment charge, and was sentenced to probation along with drug treatment.

11.      Shapard reached the age of majority and enrolled as a student at the University of Nevada, Las Vegas.

**1.6      Current Investigation**

12.      As an adult, Shapard has continued to supply youth in Utah with deadly controlled substances.[5]

**1.7      High School Student Selling Shapard's Drugs**

13.      In November 2021, detectives from the Summit County Sheriff's Office and the Park City Police Department learned that a high school student (Student 1, who in the Complaint is listed as Person 1) in the Park City area was distributing controlled substances to other students.

---

(https://www.chicagotribune.com/opinion/editorials/ct-opioid-pink-u4-epidemic-online-edit-1115-md-20161114-story.html).

[4] The legislature in Utah has prioritized treatment and rehabilitation over punishment in the juvenile system.

[5] While the allegations in the Complaint center on offenses committed in 2021 and 2022, DEA records show controlled substances enroute to the defendant at his address in Las Vegas were seized by authorities in Germany in 2020.

In like manner, CBP officers found and seized controlled substances in four packages sent to the defendant from the Netherlands in 2020 and 2021.

The detectives confronted Student 1; Student 1 confessed and identified Shapard as Student 1's source of supply for several different controlled substances. Student 1 surrendered the drugs in his possession at his residence, including drugs that came from Shapard. Student 1 provided relevant information to investigators on several occasions.

14.    In meetings with detectives, Student 1 explained that Shapard had been mailing drugs to Student 1 from Las Vegas. Student 1 knew Shapard from when Shapard lived in the Park City area. Student 1 had been using drugs supplied by Shapard, but Student 1 also acted as a middleman, connecting other users with Shapard.

15.    The detectives joined with other investigators from the DEA Salt Lake City Metro Narcotics Task Force (MNTF) to open an investigation into Shapard's drug trafficking offenses. A Postal Inspector on assignment at the MNTF began watching for packages sent by Shapard through the mail to locations of Shapard's known associates in Utah.

**1.8    December 6th Seized Package**

16.    On December 8, 2021, the Postal Inspector was notified that a package had been shipped from Las Vegas on December 6, 2021, to one of Shapard's associates in Utah (Student 1). The package was detained. The Court authorized a search warrant for the package and, on December 13, 2021, that search warrant was executed.

17.    Investigators found inside the parcel an Advil bottle containing 35 blue pills stamped with "M" and "30", consistent with the appearance of oxycodone pills.  Testing revealed that the pills contained Fentanyl—a deadly powerful synthetic opioid.[6]  Here, below, is the package and

---

[6] Fentanyl is approximately 100 times more potent than morphine and 50 times more potent than heroin. See https://www.dea.gov/sites/default/files/2020-06/Fentanyl-2020_0.pdf. Fentanyl is a leading cause of the more than 100,000 drug overdoses reported in a 12-month period ending last April. See https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm.

Fentanyl-laced fake oxycodone.

 

18.     Surveillance cameras at the post office in Las Vegas showed Shapard shipping the package.



7

### 1.9    December 17th Seized Package

19.    On December 20, 2021, the Postal Inspector was notified that a package had been

shipped from Las Vegas on December

17, 2021, to one of Shapard's associates

in Utah. The Court authorized a search

warrant for the package on December

21st, and, on December 22nd, that search

warrant was executed.



20.    Investigators found inside the

parcel a supplement bottle containing 128 pills, 25 of which were blue pills stamped "M" and

"30," consistent with the appearance of oxycodone.

21.    Testing revealed that the pills, shown below, were Fentanyl-laced fake oxycodone.[7]

 

---

[7] Indeed, for all of the Fentanyl-laced fake oxycodone pills seized during this investigation, agents either have test results from the DEA lab confirming the pills contain Fentanyl or field

22.    Investigators reviewed surveillance footage from the post office in Las Vegas and confirmed that Shapard sent the parcel, as shown above.

**1.10    Distribution of Fentanyl to an Undercover Agent on January 31, 2022**

23.    An agent at the MNTF, working undercover, made contact with Shapard using Shapard's preferred encrypted communications application. The undercover agent requested *blues*—a street term for oxycodone 30mg tablets—from Shapard.

24.    For blues, Shapard charged a premium. He represented that his pills were legitimate pharmaceutical drugs, later claiming "[t]hey're a bit pricy as they aren't presses but they are from Canada so thanks to free healthcare they aren't crazy expensive." He then followed-up with a message that further claimed his pills contained oxycodone, not Fentanyl.

25.    Writing under the handle *jelliesplacebo*, Shapard claimed his pills were not as strong as cartel pills, but warned the undercover agent to be careful because 30mg of oxycodone was the strongest pill they [the pharmaceutical companies] make.



26.    On January 31, 2022, Shapard mailed the undercover agent a package containing the requested drugs, as captured here.



tests showing the presence of Fentanyl within the pills.

27.    Shapard sent fifteen Fentanyl-laced fake oxycodone pills to the undercover agent. Shapard took his payment in Bitcoin. Shapard shipped the Fentanyl-laced fake oxycodone pills from Las Vegas to an address in Utah provided by the undercover agent.

28.    The package arrived on February 4, 2022, and a Postal Inspector transferred it to investigators.

29.    The package contained an Advil bottle that held five whole and ten halved blue pills marked with "M" and "30," consistent with oxycodone tablets.



30.    The pills were actually Fentanyl-laced fake oxycodone pills.

31.    Shapard explained to the undercover agent that he snaps his pills in half to help disguise the pills when stored in a legitimate prescription bottle.

### 1.11    Distribution of Fentanyl to an Undercover Agent on February 14, 2022

32.    After receiving the first shipment of Fentanyl-laced fake oxycodone, the undercover agent placed an order for additional blues from Shapard.

33.    On February 14, 2022, Shapard mailed from Las Vegas a package to the undercover agent in Utah. The package arrived on February 18, 2022. Here is the package and a screen capture showing Shapard mailing the package:

10

 

34.    The package contained 15 Fentanyl-laced fake oxycodone and several other capsules, shown here.



35.    Shapard sent a message to the undercover agent to see if the package arrived; when she did not respond back over the weekend, Shapard became worried. Upon hearing she received the package—and, by virtue of having responded, was still alive—Shapard expressed his relief. He wrote: "Sorry about being so worried…Just wanted to check in and make sure you weren't dead, as [it's] never a good sign when someone goes MIA after getting a f--- ton of opiates."



## 1.12    February 15th Seized Package

36.    The Postal Inspector was notified that a package had been shipped from Las Vegas by Shapard on February 15th, 2022, to one of Shapard's associates in Utah.

37.    Surveillance from the Post Office showed Shapard mailing the package:

12

 

38.    The Honorable Daphne A. Oberg authorized a search warrant for the package on

February 19, 2022; that search warrant was executed on the same day. The package and its

contents are shown below.

 

39.    Investigators found inside the parcel twenty Fentanyl-laced fake oxycodone pills.

**1.13    Defendant's Statements**

40.    Shapard has made other statements to Student 1 and the undercover agent relevant to the

charges contained in this Complaint.

### 1.13.1  Defendant's Statements regarding Pressing Pills

41.    In speaking with investigators, Student 1 recalled that Shapard had recently expressed

interest in setting up a trap house in Utah. [Trap is a street term for selling controlled

substances]. Shapard further expressed his desire to press his own pills at the trap house using a

handheld press to create his own oxycodone tablets for distribution.

### 1.13.2  Defendant's Statements exhibiting a Lack of Remorse

42.    When first identifying Shapard to investigators, Student 1 explained that Shapard was the

person who killed JV1 and JV2. Student 1 explained that he asked Shapard whether Shapard ever

thinks about the parents who lost their kids because of the drugs Shapard distributed for profit.

Shapard laughed and said no.

43.    To the undercover agent, Shapard explained that morbidity was sadly part of the drug

abuse scene. He wrote "with how sh-- is, morbidity has kinda sadly just become part of the

scene, so yeah again— seen a lot of people
wind up in bad positions, and always wanna be
here to help prevent that."



44.     Shapard even went so far as to offer the undercover his services as a drug and alcohol counselor. He wrote, "100% down to talk if ever need be (I am technically a certified drug and alcohol counselor as well, I had a surgery a year ago and a lot of time on my hands. . .)."



### 1.13.3  Defendant's Statements regarding Violence

45.     In speaking with investigators, Student 1 expressed fear of Shapard, specifically that Shapard would put out a "hit" against Student 1 or Student 1's family. Student 1 explained that Shapard threatened to kill Student 1 if Student 1 snitched to law enforcement. Student 1 exhibited fear when he spoke with investigators.

### 1.13.4 Defendant's Statements regarding Drug Running

46.　　In a text message exchange with the undercover agent, Shapard sought to reassure the undercover agent that he was not going to leave her without a drug source of supply. He wrote, "I mean, with all the sh-- I run, it can't ever stop—so don't worry im training someone to take my place."



47.     Shapard recognized the risk associated with distributing Fentanyl. When the undercover agent sought to meet up with Shapard face-to-face, he wrote that he "would honestly love to get to know you . . . it's just it would also be extremely not great if you're able to identify me in a line up . . . you're one of the few people I sell a highly addictive narcotic that the police would probably give you a plea deal for even small scale distribution on if you give up your supplier. So I go to jail for life. Thus why we're doing things on wickr that I have a disposable number connected to…"



48.     Shapard went on to explain that he has been distributing drugs for eight years; he credited his paranoia about maintaining anonymity as the reason for his success. He wrote: "my paranoia has been what's kept me out of trouble and has allowed me to do this for 8 years, and why ive been



17

able to build all the connections I got, while I've seen a lot of my homies get locked up."

**1.14   Defendant's level of Sophistication**

49.     In speaking with investigators, Student 1 explained that Shapard used the internet browser TOR to access the Dark Net. Shapard also claimed to pay $5,000USD per month as a subscription fee for access to a highly encrypted server. To communicate with associates and customers, Shapard uses an application that boasts end-to-end encryption and an inability, by design, to cooperate with government requests for the contents of communications.

50.     Shapard urged the undercover agent to make payment with a cryptocurrency other than bitcoin, claiming that bitcoin was 100% traceable.

51.     Shapard gave the undercover agent a glimpse of the effort he put into his drug trafficking. He wrote that he put in at least ten hours a week going through a process that included setting up an order with his supplier, creating an escrow account on a third-party site, transferring and moving money to make sure it is as undetectable as possible—since, he explained, the money was moving from Europe to the United States and then to Canada before being converted into cryptocurrency.

52.     Shapard claimed he was using shell companies and cryptocurrency tumblers in his effort to hide the financial trail from his crimes. He also claimed he imported his pills from Canada using an LLC to shield himself from liability.

53.    Shapard also employed traditional drug trafficking techniques designed to exclude law enforcement from infiltrating his operation. Shapard checked with one of his trusted associates to see if the associate would vouch for the undercover agent. Shapard asked, "who recommended you to me?"



54.    A short while later, Shapard remembered, and apparently checked with his associate.

55.    Shapard wrote that "you can never be too careful with anything surrounding this sh--. F---in opioids are such a radioactive group…that trading in them, if I don't keep this on the DL, I know [it] will f--- me…."

56.    In what appears to be a reference to his periodic importation of 5000 Xanax bars, Shapard went on



to draw a contrast with what appeared to be his importation of Fentanyl-laced fake oxycodone, recognizing that unlike Fentanyl,[8] the Xanax bars "don't come with minimum sentencing laws, and if you're in the state of Utah—a potential reckless endangerment charged added to the mix as well."

---

[8] Oxycodone does not trigger increased mandatory minimum sentences based upon weight/quantity; Fentanyl does at weights listed in 21 USC 841(b)(1).

57.     More recently, Shapard returned to the topic of Fentanyl and the risk drug dealers assume when distributing Fentanyl. He wrote, "Oh and heads up—if they can prove you knowingly had fentanyl in your pills you can get hit with a reckless endangerment charge and if someone dies, you can get a second degree murder charge. Even if you didn't know fentanyl was in the pills. Especially in Utah as second-degree murder comprises [] unintentional killings, and technically selling someone a pill that you should have known would kill them—so I've seen the DA in Utah push for second degree."



## 1.15    Additional Packages

58.     Two additional packages of contraband sent by Shapard were recently seized by investigators. Both contained what appeared to be vape cartridges. The packages were sent to recipients in Utah under the age of 21—the minimum age in Utah to lawfully possess nicotine products.

59.     Postal Inspectors researching Shapard's recent packages identified additional packages sent in the recent past to associates of Shapard that appear to be related to Shapard's drug trafficking efforts.

60.     One recent package, sent in secret to Student 1 by Shapard, escaped law enforcement detection.

20

**1.16    Student 1 Overdosed**

61.    On February 1, 2022, Shapard sent a package containing Fentanyl-laced pills and Xanax bars to Student 1. Here are two surveillance screen captures of Shapard sending the package:

 

62.    Law enforcement was not aware Shapard sent the package to Student 1; the package was not intercepted by law enforcement.

63.    The package arrived on February 3, 2022. On the evening of February 10, 2022, Student 1 ingested all of the remaining Fentanyl pills from the February 1st shipment. Student 1 overdosed.

64.    Student 1's father found Student 1 unconscious and called 911. A police officer arrived and began chest compressions on Student 1. EMS personnel arrived and administered Narcan,[9] which revived Student 1. After regaining consciousness, Student 1 vomited. Student 1 was transported to the hospital for additional care.

65.    Urinalysis revealed that Student 1 had Fentanyl, a Fentanyl metabolite, THC, and THC

---

[9] NARCAN Nasal Spray (Nalaxone HCL) is a medicine used for the treatment of a known or suspected opioid overdose emergency. See Narcan.com.

metabolite in his system. Student 1 confirmed the pills on which Student 1 overdosed were supplied by Shapard.

## 2.    ARGUMENT

Shapard presents an unmanageable risk of danger to the community and an unmanageable risk of flight. The United States urges the Court to detain Shapard pending the resolution of his case.

### 2.1    Legal Standard and Burden of Proof

When a case involves a serious risk that a defendant will flee, cause harm, or attempt to obstruct justice, the Bail Reform Act of 1984 provides that "a judicial officer shall hold a hearing to determine whether any condition of or combination of conditions … will reasonably assure the appearance of the person as required and the safety of any other person and the community."[10] If after a hearing, the Court "finds that no conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial."[11]

And even though "[i]n our society, liberty is the norm, and detention prior to trial is the carefully limited exception,"[12] Congress identified a sub-set of particularly violent and dangerous crimes for which it mandated that a presumption of detention apply.[13] All six counts contained in the Complaint are among those crimes for which Congress declared that a presumption of detention arises.[14] As a starting point, the Court is required to presume that "no condition or

---

[10] 18 U.S.C. § 3142(f).
[11] 18 U.S.C. § 3142(e)(1).
[12] *United States v. Salerno*, 481 U.S. 739, 755 (1987).
[13] 18 U.S.C. § 3142(f)(1).
[14] Doc. 1, Complaint.

combination of conditions will reasonably assure the appearance of [the defendant] as required and the safety of the community."[15]

In a case like this where the presumption applies, the defendant must introduce sufficient evidence to rebut the presumption of detention; if he fails to do so, detention should be ordered.[16] If the defendant presents evidence sufficient to rebut the presumption, the Court should then consider evidence presented by the United States and defendant to determine if detention is nevertheless warranted.[17]

If the defendant presents sufficient evidence to rebut the presumption of detention, the Court should then consider the factors set forth in 18 U.S.C. § 3142(g). Specifically, in determining whether there are no conditions that will reasonably assure the defendant's appearance, the Court shall "take into account the available information concerning—(1) the nature and circumstance of the offense charged…; (2) the weight of the evidence against the person; (3) the history and characteristics of the person…; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release…."[18]

Assuming the defendant presents sufficient evidence to overcome the presumption of detention, the United States must then prove a serious, unmanageable risk of flight by "a preponderance of the evidence" for the Court to order the defendant detained.[19]  When the

---

[15] 18 U.S.C. § 3142(e)(3).
[16] *United States v. Stricklin*, 932 F.2d 1353, 1354-55 (10th Cir. 1991).
[17] *Id*.
[18] 18 U.S.C. § 3142(g).
[19] *United States v. Cisneros*, 328 F.3d 610, 613 (10th Cir. 2003) (sustaining the district court's determination that "the government had proved by a preponderance of the evidence that Cisneros posed a serious risk of flight such that no conditions of release would reasonably assure Cisnero's presence at trial.").

United States seeks to detain a defendant based upon danger to the community, the United States' burden of proof is clear and convincing evidence.[20]

## 2.2     Shapard presents an Unmanageable Risk of Danger to the Community

Shapard presents an acute risk of danger to the community. No conditions of release can be crafted that will ameliorate the risk Shapard poses. Ankle monitors can be easily removed. Computer monitoring can be avoided by simply purchasing a new device at Walmart. Shapard has already participated in treatment and counseling, with no change in his desire to earn a profit by distributing deadly synthetic opioids.

Curfew would be meaningless since his drug acquisition is internet-based and his distribution uses the U.S. Mails. Shapard is savvy enough to defeat drug testing by using substances for which tests are rarely (if ever) conducted. But, more fundamentally, there are no conditions of release that will remove the serious risk Shapard poses to the community, because, at his core, Shapard has no desire to stop distributing opioids.

### 2.2.1     The nature and circumstance of the offense charged

Shapard distributed Fentanyl disguised as oxycodone to drive up profits. Fentanyl is a powerful synthetic opioid analgesic that is similar to morphine but is 50 to 100 times more potent.[21] Because of its high potency, Fentanyl ingestion greatly increases the risk of overdose and death, especially for drug users who are unaware they are consuming Fentanyl.[22]

> Like heroin, morphine, and other opioid drugs, fentanyl works by binding to the body's opioid receptors, which are found in areas of the brain that control pain and emotions. When opioid drugs bind to these receptors, they can drive up dopamine levels in the brain's reward areas, producing a state of euphoria and relaxation. Fentanyl's effects resemble those of heroin and include euphoria, drowsiness, nausea, confusion, constipation, sedation, tolerance, addiction, respiratory

---

[20] 18 U.S.C. § 3142(f).

[21] https://www.drugabuse.gov/drugs-abuse/fentanyl (accessed March 4, 2022).

[22] https://www.drugabuse.gov/publications/drugfacts/fentanyl (accessed March 4, 2022).

depression and arrest, unconsciousness, coma, and death. . . The high potency of fentanyl greatly increases risk of overdose, especially if a person who uses drugs is unaware that a powder or pill contains fentanyl.[23]

Fentanyl overdoses have spiked over the last several years; overdose deaths from synthetic opioids such as Fentanyl were nearly 12 times higher in 2019 than 2013.[24]

Shapard purposefully misled his customers by claiming his pills were legitimate pharmaceutical pills containing Oxycodone, not Fentanyl. In addition to charging prices consistent with street prices for real Oxycodone 30mg pills, Shapard openly represented his pills were Oxycodone, not Fentanyl, as shown below.



Test results on seized pills exposed his lie; Shapard's pills were Fentanyl-laced fake oxycodone. By claiming his pills were legitimate oxycodone, but supplying his customers with Fentanyl, Shapard was needlessly endangering the lives of his customers. And had it not been for timely intervention on February 10, 2022, Student 1 would have died from a Fentanyl overdose after ingesting Fentanyl-laced fake oxycodone pills distributed by Shapard.

---

[23]*Id.*
[24] https://www.cdc.gov/opioids/basics/fentanyl.html (accessed March 3, 2022).

### 2.2.2    The weight of the evidence against the defendant

The weight of the evidence against Shapard is strong; there is no doubt he distributed the Fentanyl-laced fake oxycodone pills in each count—he was caught on surveillance each time he mailed one of the parcels alleged in the Complaint. And his text messages with the undercover agent remove all doubt that he knew the devastating harm that results from distributing opioid drugs. When the undercover agent did not respond quickly after a shipment of Fentanyl-laced fake oxycodone arrived, Shapard began to worry since it is "never a good sign when someone goes MIA after getting a f--- ton of opiates."



Despite acknowledging the harm, he continued to supply Fentanyl to customers.

### 2.2.3    The history and characteristics of the defendant

Shapard distributed drugs that killed two young men. He showed no remorse. When Student 1 asked Shapard whether Shapard ever thought about the parents whose children died because they ingested Shapard's drugs, Shapard laughed and said no. He has shown over the last eight years that he will continue to distribute deadly drugs when not incarcerated.

Shapard sought to normalize overdose deaths as "part of the scene," but assured that he wanted "to help prevent" people from winding up in "bad positions."



In addition to lacking remorse, Shapard also exhibited remarkable callousness. Shapard unflinchingly shipped Fentanyl-laced fake oxycodone to customers, like the undercover agent, while simultaneously offering his services as a certified drug and alcohol counselor:



Shapard's history is defined by the last eight years of his life. He boasted to the undercover officer that he has been dealing drugs for eight years.



He claimed his paranoia in favor of conducting drug transactions at a distance has enabled him to succeed as a drug dealer for so long. In response to an attempt by the undercover agent to meet face to face (to arrest Shapard), Shapard explained that he "would honestly love to get to know you . . . it's just it would also be extremely not great if you're able to identify me in a line up."



Shapard exhibited a high level of sophistication. Even if just half of his boast in the following message is true, he ranks among the most sophisticated defendants who will appear before the Court.



Shapard claimed that he put in at least ten hours a week going through a process that included setting up an order with his supplier, creating an escrow account on a third-party site, transferring and moving money to make sure it is as undetectable as possible—since, he explained, the money was moving from Europe to the United States and then to Canada before being converted into cryptocurrency. Shapard claimed he was using shell companies and cryptocurrency tumblers in his effort to hide the financial trail from his crimes. He also claimed

he imported his pills from Canada using an LLC to shield himself from liability. All of these steps show Shapard operated with a high level of sophistication.

Shapard knows how to access the Dark Net using an operating system that wipes a person's digital footprints. Shapard understands how to purchase drugs off the Dark Net using cryptocurrency. Shapard understands and utilizes communication platforms that provide end-to-end encryption. Shapard understands the need to vet potential customers with known associates. Shapard understands the importance of maintaining anonymity for drug traffickers. Shapard understands the penalties he faces, if convicted. He is remarkably sophisticated.

### 2.2.4  History of alcohol or substance abuse

Shapard claimed to use opioids in communications with the undercover agent. Drug use is not rational, but it is predictable. A drug abuser is much less likely to follow orders of the Court because feeding their addiction overrules all other concerns. A drug abuser is much more likely to lie to the Court or supervisors in order to gain enough freedom to acquire more drugs to ingest. A drug abuser is much more likely to cause harm to others, whether through crimes attendant to drug use or through acts of violence.

### 2.2.5  Subject to lengthy period of incarceration if convicted

Shapard is charged with a crime that carries a twenty-year, minimum mandatory sentence and a maximum sentence of life imprisonment. Shapard will not be eligible for safety-valve relief because the crime resulted in serious bodily injury to Student 1. A sentence of such magnitude provides a strong incentive to flee, a strong incentive to intimidate or harm witnesses, and a strong incentive to discard the future and act recklessly in the present.

**2.2.6      The nature and seriousness of the danger posed by the defendant**

Shapard has shown he will not stop distributing deadly opioids to students in Utah. The predictable result is death. But for timely medical intervention, Student 1 would have died from drugs distributed by Shapard. JV 1 and JV 2 died by overdosing on drugs distributed by Shapard. When Shapard is free, students suffer. Accordingly, Shapard presents a danger to all young people who use drugs in Park City, specifically, and Utah generally.

**2.3      Shapard presents an Unmanageable Risk of Flight**

Shapard presents a risk of flight such that no conditions of release will sufficiently ensure his appearance at trial and the United States urges the Court to detain Shapard as an unmanageable risk of flight. In 2016, after distributing drugs that killed JV 1 and JV 2, Shapard and his father fled the jurisdiction despite only facing the prospect of charges in juvenile court. Here, where the mandatory-minimum sentence for a conviction on Count One is twenty years in federal prison, Shapard faces much stronger incentives to flee than when he fled in 2016. Further, his use of technology and cryptocurrencies would allow him easy access to funds and travel arrangements before a pretrial services officer could detect his plans.  His past actions are the best predictor of his future choices. If given the opportunity to flee, he will flee.

//

31

**3.    CONCLUSION**

Because the proffered evidence shows Shapard presents an unmanageable risk of danger

to the community and an unmanageable risk of flight, the United States urges the Court to detain

Shapard pending trial.


Respectfully Submitted this 8th day of March, 2022.


ANDREA T. MARTINEZ
United States Attorney


 */s/ Michael Gadd*

MICHAEL GADD
Special Assistant United States Attorney